# EXHIBIT A

| | |
|---|---|
| **DISTRICT COURT, DENVER COUNTY, COLORADO**<br>1437 Bannock Street, Room 256<br>Denver, CO  80202 | DATE FILED: December 10, 2014 5:13 PM<br>FILING ID: 4BB20DC4B7771<br>CASE NUMBER: 2014CV34639 |
| **Plaintiff:**      THE POLICE RETIRMENT SYSTEM OF ST. LOUIS, derivatively on behalf of THE WESTERN UNION COMPANY,<br><br>v.<br><br>**Defendants:**   HIKMET ERSEK; DINYAR S. DEVITRE; LINDA FAYNE LEVINSON; MICHAEL A. MILES, JR.; BETSY D. HOLDEN; ALAN J. LACY; WULF VON SCHIMMELMANN; DENNIS STEVENSON; ROBERTO G. MENDOZA; JACK M. GREENBERG; RICHARD A. GOODMAN; SOLOMON D. TRUJILLO; and SCOTT T. SCHEIRMAN,<br><br>and<br><br>**Nominal Defendant:** THE WESTERN UNION COMPANY, a Delaware corporation. | ▲COURT USE ONLY ▲ |
| *Attorneys for Plaintiff*<br><br>Daniel A. Wartell, No. 34902<br>JONES & KELLER, P.C.<br>1999 Broadway, Suite 3150<br>Denver, CO 80202<br>Phone: (303) 573-1600<br>Fax: (303) 573-8133<br>Email: dwartell@joneskeller.com | Case Number:<br><br>Courtroom: |
| **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT** ||

Plaintiff The Police Retirement System of St. Louis, by its undersigned counsel, submits this Verified Shareholder Derivative Complaint on behalf of nominal defendant The Western Union Company ("Western Union" or the "Company") against the defendants named herein. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.  The complaint is also based on the investigation of plaintiff's counsel, which included, among other things: a review of public filings with the U.S. Securities and Exchange Commission ("SEC") of Western Union; a review of court dockets and filings related to litigation against Western Union pending in the State of Colorado; and a review of news reports, press releases, and other publicly available sources.

Counsel's investigation also included a review and analysis of documents obtained through a books and records request pursuant to 8 Delaware General Corporation Law Code section 220.  On April 11, 2014, plaintiff, through its counsel, made a books and records demand on Western Union (the "Demand").  Western Union commenced its document production to plaintiff on July 28, 2014.  On September 22, 2014, Western Union made its final production in response to the Demand.  The documents produced by the Company include, among other things: ███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a verified shareholder derivative action brought by plaintiff on behalf of nominal defendant Western Union against certain of its current and former officers and directors for breaches of fiduciary duties, waste of corporate assets, and unjust enrichment as a result of their deliberate, reckless, or grossly negligent non-compliance with the law.  These wrongs

resulted in billions of dollars in damages to Western Union, in addition to damage to its reputation, goodwill, and standing in the business community.

2.      Western Union is a global money movement and payment service provider, offering services through a combined network of over 500,000 agent locations in more than 200 countries and territories and over 100,000 automated teller machines.  In 2013, Western Union completed 242 million customer-to-customer ("C2C") transactions worldwide, moving $82 billion of principal between customers, and 459 million business payments.  The  vast scope of Western Union's financial services require that it be made subject to various laws and regulatory requirements that allow for the legal and proper use of its operations by its customers, employees, and agents.  The most prevalent of these laws is the Bank Secrecy Act ("BSA") and the rules promulgated thereunder, and similar state laws and regulations, which require Western Union to file Currency Transaction Reports ("CTRs") with government regulators for money transfers exceeding $10,000.  Among other rules, Western Union is further required to report suspicious activity to regulators by submitting Suspicious Activity Reports ("SARs") if a transaction involves $2,000 or more and the Company has reason to suspect that the transaction involves criminal proceeds or is intended to evade any BSA regulation, including the mandatory recording and reporting requirements.

3.      These laws and regulations are specifically enforced as to money transfer operations like Western Union because this manner of financial transaction is known to be popular among money launderers and criminal organizations to introduce the proceeds they earn from their illicit activities into the financial system and to transfer funds outside of the United States.  Indeed, there can be severe penalties imposed on financial institutions for their failure to make proper reports concerning large financial transfers and suspicious criminal activity.  The BSA provides for civil and criminal penalties against financial institutions for failing to keep

identifiers for those who transfer more than $3,000 and for failing to file required CTRs and SARs.

4.        Since at least 2003, various government organizations have repeatedly reprimanded the Company for its failure to comply with applicable law.  These punishments included: (i) $11 million in fines imposed by the Financial Crimes Enforcement Network ("FinCEN") and the New York Banking Department in 2003 for failing to comply with the BSA and willfully failing to submit 662 SARs; (ii) entering into a Consent Agreement with the California Department of Financial Institutions in August 2003 for its failure to implement an adequate anti-money laundering monitoring and compliance program to ensure that it and its agents complied with the BSA; (iii) entering into a Consent Order with the Arizona Department of Financial Institutions in August 2006 and paying $3 million in fines for failing to maintain adequate records and failing to submit SARs; (iv) entering into a second Consent Order with the Arizona Department of Financial Institutions in October 2008 and paying $2 million in fines for failing to keep adequate records; and (v) enter into settlements and compliance agreements with the Arizona Department of Financial Institutions in 2010 and 2013 (described more fully below).

5.        The Company's recent settlements with Arizona is the most extensive to date. The settlements concern the Southwest Border Area.[1] Criminal activity is thought to represent a considerable share of the Company's business in the Southwest Border Area, as drug cartels and human traffickers rely on Western Union to repatriate their illegal profits.  Thus, the Individual Defendants (as defined herein) had a short-term incentive to maintain the Company's lax controls in order to allow the Company's network of agents to preserve their lucrative business dealings with criminals who used the Company's services for illegal money transfers.  Western Union

---

[1] The "Southwest Border Area" refers to the areas in Arizona, California, New Mexico, and Texas that border Mexico.

subsequently admitted in the agreements that the Company had reason to know that its agents "were knowingly engaged in a pattern of money laundering violations that facilitated human smuggling." As a result of this continued failure to implement adequate systems of controls and oversight, on February 11, 2010, Western Union, through its wholly owned subsidiary, Western Union Financial Services, Inc. ("WUFSI"), entered into the first of these agreements with the Arizona Department of Financial Institutions (the "Settlement Agreement").

6.        As part of the Settlement Agreement, Western Union paid Arizona $21 million for its costs in investigating the Company and $50 million to fund a non-profit organization promoting safety and security along the U.S. and Mexico border in the Southwest Border Area. The Settlement Agreement also called for Western Union to cooperate with and provide access to requested information to an independent monitor assigned to evaluate and recommend improvements for the Company's anti-money laundering compliance program.  The Company stated that it expected its compliance upgrades to cost approximately $23 million.  Finally, Western Union agreed that its Board would adopt, and did adopt, a binding resolution reflecting its understanding of each and every one of the terms of the Settlement Agreement.  Notably, *six of the eleven* current directors were Board members when the Board adopted this resolution. Thus, at a minimum, these defendants knew of Western Union's prior violations, their own obligation to adopt and implement effective controls to prevent future violations, and the serious consequences of any ongoing failure on their part to ensure compliance with applicable law. Indeed, Western Union's 2012 Annual Report on Form 10-K filed with the SEC on February 22, 2013, specifically recognized the defendants' awareness of the potentially monumental penalties that awaited companies which failed to strictly adhere to regulations aimed at curtailing the assistance of financial institutions in the laundering and transfer of criminal proceeds: "Failure, by Western Union, our agents, or their subagents ... to comply with any of these requirements or their interpretation could result in the suspension or revocation of a license or registration

required to provide money transfer services and/or payment services or foreign exchange products, the limitation, suspension or termination of services, the seizure of our assets, and/or imposition of civil and criminal penalties."

7.     Ongoing compliance issues associated with the Company's obligations under the Settlement Agreement, including responding to requests made by an independent monitor appointed to assess Western Union's compliance with the agreement, required the Company to enter into an amended Settlement Agreement with the state of Arizona, extending the term of the Settlement Agreement from mid-2013 to the end of 2017.  Among other things, the amended Settlement Agreement forced the Company to implement ten of the monitor's proposals regarding compliance and required Western Union to provide access to certain transaction data that it was withholding from the monitor.

8.     The Southwest Border Area is not the only region where nonexistent and lax internal controls and have enabled criminal activity to occur using the money transfer capabilities of Western Union.  The Company is currently the target of ongoing criminal investigations headed by the U.S. Attorney's Offices for the Central District of California (the "USAO-CDCA"), the Eastern District of Pennsylvania ("USAO-EDPA"), and the Southern District of Florida ("USAO-SDFL") for its role in facilitating money laundering and structuring[2] crimes.

9.     The compliance measures forced upon the Company to adhere to the settlement agreements significantly impeded Western Union's Mexican and Latin American businesses and cost substantially more than claimed.  The Individual Defendants caused the Company to improperly portray a positive picture regarding its improving trends and growing revenue for its

---

[2] Structuring is the practice of executing financial transactions in a specific pattern calculated to avoid the creation of certain records and reports required by law, such as the BSA.

business in the Americas (including Mexico and Latin America) in order avoid the investor backlash that would inevitably accompany the recognition of the Company's reliance on criminal activity using its services for revenue stability and growth.

10.     The first crack in the Company's Latin American business began to show on an earnings conference call on February 7, 2012, two years after the Settlement Agreement was signed.  In a PowerPoint presentation associated with that call, the Company noted that Mexican revenue declined rather than grew as claimed.  Three weeks later, in the Company's 2011 Annual Report on Form 10-K filed with the SEC on February 24, 2012, Western Union disclosed that its Mexican business "is being affected by on-going changes to [its] compliance procedures related to the [Settlement Agreement]."  The Form 10-K also disclosed that the monitor, put in place under the Settlement Agreement to review the Company's compliance, recommended a number of changes, and such changes would "likely have an adverse effect on [Western Union's] United States to Mexico business."

11.     Then, on October 30, 2012, Western Union disclosed that the compliance measures required by the Settlement Agreement resulted in the loss of over 7,000 agent locations, comprising *40%* of the Company's network in Mexico.  In particular, the agents could not meet the new requirements to increase their real-time transaction visibility.

12.     The revelations concerning the Company's compliance issues and true business health caused its market capitalization to plunge 34%, erasing nearly $3.6 billion in value.  As a direct result of the defendants' improper statements, the Company is now the subject of a federal securities class action lawsuit filed in the U.S. District Court for the District of Colorado.  The securities class action poses the risk of billions of dollars in damages to the Company in addition to the enormous liability the Company is already facing in the numerous ongoing federal criminal investigations concerning the Company's continued failure to maintain an effective anti-money laundering compliance program.

13.     Before the truth about the Company's business health was finally revealed, however, and in order to further the deception, Western Union's Board caused the Company to repurchase over **$1.6 billion** worth of its own stock.  In particular, from April 1, 2010 through October 31, 2012, the Company repurchased 90,475,703 shares at an average price of $18.25 per share.  This price is substantially above the Company's stock price of $12.73 per share on October 31, 2012, after the truth of the Company's business prospects and financial health was revealed and the price of Western Union stock plummeted.

14.     While making many of the improper statements mentioned above, and at the same time that he was causing the Company to repurchase Western Union stock at artificially inflated prices, defendant Scott T. Scheirman ("Scheirman"), the Company's former Chief Financial Officer ("CFO"), sold off 389,258 shares of his personally held Western Union stock for proceeds of over **$8.3 million**.

15.     ██ ███ ████ ██ ████ ████ ████ ████ ██ ████ ███████████████████████████████████████ █████████████████████████████████ ████████████████████████████████.  Plaintiff brings this action against the Individual Defendants to repair the harm that they caused the Company.

### JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to Article VI, section 9, of the Colorado Constitution and personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in Colorado, or is an individual who has sufficient minimum contacts with Colorado so as to render the exercise of jurisdiction by the Colorado courts permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this Court because one or more of the defendants resides in this County and defendants have received substantial compensation in this County by doing business here and engaging in numerous activities that had an effect in this County.

**THE PARTIES**

**Plaintiff**

18.     Plaintiff The Police Retirement System of St. Louis was a shareholder of Western Union at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Western Union shareholder.

**Nominal Defendant**

19.     Nominal Defendant Western Union is a Delaware corporation with principal executive offices located at 12500 East Belford Avenue, Englewood, Colorado.  Together with its Vigo[SM] and Orlandi Valuta® branded payment services, Western Union provides consumers and businesses with fast and convenient ways to send and receive money around the world.[3]

**Defendants**

20.     Defendant Hikmet Ersek ("Ersek") is Western Union's President and Chief Executive Officer ("CEO") and has been since September 2010 and a director and has been since April 2010.  Defendant Ersek was also Western Union's Chief Operating Officer from January 2010 to September 2010; Executive Vice President and Managing Director, Europe, Middle East, Africa, and Asia Pacific Region from December 2008 to December 2009; Executive Vice President and Managing Director, Europe, Middle East, Africa, and South Asia from September 2006 to December 2008; and held various other positions with the Company since September 1999.  Defendant Ersek is named as a defendant in a related securities class action complaint that

---

[3] Vigo and Orlandi Valuta are subsidiaries of Western Union.  Both subsidiaries have agent locations in the Southwest Border Area.

alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").  Defendant Ersek knowingly, recklessly, or with gross negligence: (i) caused Western Union to fail to comply with its obligations pursuant to the Settlement Agreement; (ii) made improper statements concerning Western Union's financial health and business prospects that misrepresented the costs and impact of the Settlement Agreement; (iii) caused Western Union to repurchase its artificially inflated stock; and (iv) failed to implement and maintain adequate internal controls. Western Union paid defendant Ersek the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2013 | $1,000,000 | $4,375,000 | $2,000,000 | $1,260,000 | $122,500 | $8,757,500 |
| 2012 | $987,500 | $3,758,900 | $1,980,000 | - | $265,800 | $6,992,200 |
| 2011 | $920,800 | $2,897,300 | $1,485,000 | $2,258,300 | $311,000 | $7,872,400 |
| 2010 | $835,700 | $2,416,700 | $2,416,700 | $1,509,900 | $683,800 | $7,862,800 |

21.     Defendant Dinyar S. Devitre ("Devitre") is a Western Union director and has been since September 2006.  Defendant Devitre is also Chairman of Western Union's Corporate Governance and Public Policy Committee and has been since May 2012.  ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████  Defendant Devitre was also a member of Western Union's Audit Committee from at least March 2009 to at least April 2014 and was Chairman of that Committee from at least March 2009 to May 2012.  Defendant Devitre knowingly or recklessly: (i) caused Western Union to fail to comply with its obligations pursuant to the Settlement Agreement; (ii) made improper statements concerning Western Union's financial health and business prospects that misrepresented the costs and impact of the Settlement Agreement; (iii) reviewed and approved the Company's improper statements

concerning its financial health and business prospects; (iv) caused Western Union to repurchase its artificially inflated stock; and (v) failed to implement and maintain adequate internal controls. Western Union paid defendant Devitre the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2013 | $120,000 | - | $130,000 | $25,000 | $275,000 |
| 2012 | $110,000 | - | $130,000 | $25,300 | $265,300 |
| 2011 | $110,000 | - | $130,000 | $35,600 | $275,600 |
| 2010 | $98,800 | $50,000 | $50,000 | $18,000 | $216,800 |

22.     Defendant Linda Fayne Levinson ("Fayne Levinson") is a Western Union director and has been since September 2006.  Defendant Fayne Levinson is also a member of Western Union's Audit Committee and has been since at least March 2009 and a member of the Corporate Governance and Public Policy Committee and has been since at least April 2013. ████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████  Defendant Fayne Levinson knowingly or recklessly: (i) caused Western Union to fail to comply with its obligations pursuant to the Settlement Agreement; (ii) made improper statements concerning Western Union's financial health and business prospects that misrepresented the costs and impact of the Settlement Agreement; (iii) reviewed and approved the Company's improper statements concerning its financial health and business prospects; (iv) caused Western Union to repurchase its artificially inflated stock; and (v) failed to implement and maintain adequate internal controls.  Western Union paid defendant Fayne Levinson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2013 | $95,000 | $130,000 | - | $25,000 | $250,000 |
| 2012 | $120,000 | $65,000 | $65,000 | $100 | $250,100 |
| 2011 | $120,000 | $65,000 | $65,000 | - | $250,000 |
| 2010 | $101,300 | $50,000 | $50,000 | - | $201,300 |

23.     Defendant Michael A. Miles, Jr. ("Miles") is a Western Union director and has been since September 2006.  Defendant Miles was also a member of Western Union's Corporate Governance and Public Policy Committee from at least March 2009 to at least April 2013.  ██

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████             Defendant Miles knowingly or recklessly: (i) caused Western Union to fail to comply with its obligations pursuant to the Settlement Agreement; (ii) made improper statements concerning Western Union's financial health and business prospects that misrepresented the costs and impact of the Settlement Agreement; (iii) caused Western Union to repurchase its artificially inflated stock; and (iv) failed to implement and maintain adequate internal controls.  Western Union paid defendant Miles the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2013 | $95,000 | $130,000 | - | $25,000 | $250,000 |
| 2012 | $95,000 | $130,000 | - | $1,500 | $226,500 |
| 2011 | $87,900 | $130,000 | - | $3,000 | $220,900 |
| 2010 | $73,800 | $50,000 | $50,000 | - | $173,800 |

24.     Defendant Betsy D. Holden ("Holden") is a Western Union director and has been since September 2006.  Defendant Holden is also a member of Western Union's Corporate Governance and Public Policy Committee and has been since at least March 2009 and was Chairman of that Committee in at least April 2012.  ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████             Defendant Holden knowingly or recklessly: (i) caused Western Union to fail to comply with its obligations pursuant to the Settlement Agreement; (ii) made improper statements concerning Western Union's financial health and business prospects that

misrepresented the costs and impact of the Settlement Agreement; (iii) caused Western Union to repurchase its artificially inflated stock; and (iv) failed to implement and maintain adequate internal controls.   Western Union paid defendant Holden the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2013 | $110,000 | $130,000 | - | $28,000 | $268,000 |
| 2012 | $106,000 | $130,000 | - | $17,100 | $253,100 |
| 2011 | $94,200 | $130,000 | - | $19,200 | $243,400 |
| 2010 | $73,800 | $50,000 | $50,000 | $26,000 | $199,800 |

25.    Defendant Alan J. Lacy ("Lacy") was a Western Union director from September 2006 to May 2011.  Defendant Lacy was also a member of Western Union's Audit Committee and Chairman of the Corporate Governance and Public Policy Committee from at least March 2009 to at least April 2011. ████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

████████    Defendant Lacy knowingly or recklessly: (i) caused Western Union to fail to comply with its obligations pursuant to the Settlement Agreement; (ii) made improper statements concerning Western Union's financial health and business prospects that misrepresented the costs and impact of the Settlement Agreement; (iii) reviewed and approved the Company's improper statements concerning its financial health and business prospects; (iv) caused Western Union to repurchase its artificially inflated stock; and (v) failed to implement and maintain adequate internal controls.  Western Union paid defendant Lacy the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2011 | $42,600 | $65,000 | $65,000 | $25,000 | $197,600 |
| 2010 | $98,800 | $50,000 | $50,000 | $25,000 | $223,800 |

26.    Defendant Wulf von Schimmelmann ("von Schimmelmann") was a Western Union director from July 2009 to May 2014.  Defendant von Schimmelmann was also a member of Western Union's Corporate Governance and Public Policy Committee from July 2009 to at least April 2014 ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████.  Defendant von Schimmelmann knowingly or recklessly: (i) caused Western Union to fail to comply with its obligations pursuant to the Settlement Agreement; (ii) made improper statements concerning Western Union's financial health and business prospects that misrepresented the costs and impact of the Settlement Agreement; (iii) caused Western Union to repurchase its artificially inflated stock; and (iv) failed to implement and maintain adequate internal controls.  Western Union paid defendant von Schimmelmann the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2013 | $85,000 | $130,000 | - | - | $215,000 |
| 2012 | $85,000 | $130,000 | - | $1,500 | $216,500 |
| 2011 | $85,000 | $130,000 | - | $9,600 | $224,600 |
| 2010 | - | $86,900 | $86,900 | - | $173,800 |

27.    Defendant Dennis Stevenson ("Stevenson") was a Western Union director from September 2006 to May 2012.  Defendant Stevenson was also a member of Western Union's Corporate Governance and Public Policy Committee from at least March 2009 to at least April 2012. ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████.  Defendant Stevenson knowingly or recklessly: (i) caused Western Union to fail to comply with its obligations pursuant to the Settlement Agreement; (ii) made improper statements concerning Western Union's financial health and business prospects that misrepresented the costs and impact

of the Settlement Agreement; (iii) caused Western Union to repurchase its artificially inflated stock; and (iv) failed to implement and maintain adequate internal controls. Western Union paid defendant Stevenson the following compensation as a director:

| Fiscal Year | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2012 | $86,300 | $128,700 | - | $215,000 |
| 2011 | $86,300 | $128,700 | $1,400 | $216,400 |
| 2010 | $68,500 | $105,300 | $8,100 | $181,900 |

28.     Defendant Roberto G. Mendoza ("Mendoza") is a Western Union director and has been since September 2006. Defendant Mendoza is also a member of Western Union's Audit Committee and has been since at least March 2009. Defendant Mendoza knowingly or recklessly: (i) caused Western Union to fail to comply with its obligations pursuant to the Settlement Agreement; (ii) made improper statements concerning Western Union's financial health and business prospects that misrepresented the costs and impact of the Settlement Agreement; (iii) reviewed and approved the Company's improper statements concerning its financial health and business prospects; (iv) caused Western Union to repurchase its artificially inflated stock; and (v) failed to implement and maintain adequate internal controls. Western Union paid defendant Mendoza the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2013 | $95,000 | $65,000 | $65,000 | - | $225,000 |
| 2012 | $95,000 | $65,000 | $65,000 | $400 | $225,400 |
| 2011 | $95,000 | $65,000 | $65,000 | $300 | $225,300 |
| 2010 | $83,800 | $50,000 | $50,000 | - | $183,800 |

29.     Defendant Jack M. Greenberg ("Greenberg") is Western Union's Non-Executive Chairman of the Board and a director and has been since September 2006. Defendant Greenberg knowingly or recklessly: (i) caused Western Union to fail to comply with its obligations pursuant to the Settlement Agreement; (ii) made improper statements concerning Western Union's

financial health and business prospects that misrepresented the costs and impact of the Settlement Agreement; (iii) caused Western Union to repurchase its artificially inflated stock; and (iv) failed to implement and maintain adequate internal controls.  Western Union paid defendant Greenberg the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2013 | $125,000 | $175,000 | $175,000 | $15,000 | $490,000 |
| 2012 | $125,000 | $175,000 | $175,000 | $26,800 | $501,800 |
| 2011 | $125,000 | $175,000 | $175,000 | $29,900 | $504,900 |
| 2010 | $106,300 | $175,000 | $175,000 | $38,500 | $494,800 |

30.    Defendant Richard A. Goodman ("Goodman") is a Western Union director and has been since January 2012.  Defendant Goodman is also Chairman of Western Union's Audit Committee and has been since May 2012 and a member of that Committee and has been since January 2012.  Defendant Goodman knowingly or recklessly: (i) caused Western Union to fail to comply with its obligations pursuant to the Settlement Agreement; (ii) made improper statements concerning Western Union's financial health and business prospects that misrepresented the costs and impact of the Settlement Agreement; (iii) caused Western Union to repurchase its artificially inflated stock; and (iv) failed to implement and maintain adequate internal controls.  Western Union paid defendant Goodman the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2013 | $110,000 | $65,000 | $65,000 | $25,000 | $265,000 |
| 2012 | $104,100 | $130,000 | - | $21,500 | $255,600 |

31.    Defendant Solomon D. Trujillo ("Trujillo") is a Western Union director and has been since July 2012.  Defendant Trujillo knowingly or recklessly: (i) caused Western Union to fail to comply with its obligations pursuant to the Settlement Agreement; (ii) made improper statements concerning Western Union's financial health and business prospects that

misrepresented the costs and impact of the Settlement Agreement; (iii) caused Western Union to repurchase its artificially inflated stock; and (iv) failed to implement and maintain adequate internal controls. Western Union paid defendant Trujillo the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2013 | $85,000 | $65,000 | $65,000 | - | $215,000 |
| 2012 | $38,100 | $58,600 | - | $1,400 | $98,100 |

32.     Defendant Scheirman was Western Union's Executive Vice President and CFO from September 2006 to December 2013 and held a senior advisory role from December 2013 to February 2014. Defendant Scheirman was also Senior Vice President and CFO of First Data's money transfer operation, Western Union, from 1999 to 2006 and held various other positions with First Data since 1992. Defendant Scheirman is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Scheirman knowingly, recklessly, or with gross negligence: (i) caused Western Union to fail to comply with its obligations pursuant to the Settlement Agreement; (ii) made improper statements concerning Western Union's financial health and business prospects that misrepresented the costs and impact of the Settlement Agreement; (iii) caused Western Union to repurchase its artificially inflated stock; and (iv) failed to implement and maintain adequate internal controls. Moreover, while in possession of material, non-public information concerning Western Union's true business health, defendant Scheirman sold 389,258 shares of his stock for $8,336,705.56 in proceeds. Western Union paid defendant Scheirman the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2013 | $585,300 | - | $1,311,500 | $577,500 | $511,600 | $48,400 | $3,034,300 |
| 2012 | $581,600 | - | $1,096,400 | $577,500 | $133,500 | $74,200 | $2,463,200 |
| 2011 | $558,300 | $200,000 | $965,800 | $495,000 | $871,300 | $40,400 | $3,130,800 |
| 2010 | $536,000 | $50,900 | $400,000 | $400,000 | $709,200 | $51,300 | $2,147,400 |

33.     The defendants identified in ¶¶20, 32 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶20-31 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶21-27 are referred to herein as the "Corporate Governance and Public Policy Committee Defendants."  The defendants identified in ¶¶21-22, 25, 28 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶20-32 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

34.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Western Union and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Western Union in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Western Union and not in furtherance of their personal interest or benefit.

35.     To discharge their duties, the officers and directors of Western Union were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Western Union were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects;

(c)      conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations; and

(d)      remain informed as to how Western Union conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

36.



**Breaches of Duties**

37.      The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Western Union, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

38.      The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company fail to comply with the Settlement, fail to implement proper internal controls to avoid money laundering, and to

misrepresent its business prospects.  These improper practices caused Western Union to incur substantial damage.

40. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Western Union, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Western Union has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Corporate Governance and Public Policy Committee Defendants**

40. The Corporate Governance and Public Policy Committee Defendants, defendants Devitre, Fayne Levinson, Miles, Holden, Lacy, von Schimmelmann, and Stevenson, also owed additional specific duties to Western Union.  The Corporate Governance and Public Policy Committee Defendants were tasked with "develop[ing] and recommend[ing] to the Board corporate governance guidelines for the Company" and "review[ing] and advis[ing] the Board regarding matters of public policy and social responsibility as they relate to the Company."

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████.  The Corporate Governance and Public Policy Committee met six times in 2010, five times in 2011, seven times in 2012, and nine times in 2013.  As a result of these meetings and their duties pursuant to the Corporate Governance and Public Policy Committee Charter, the Corporate Governance and Public Policy Committee Defendants knew or recklessly disregarded that Western Union was struggling to comply with the Settlement Agreement and continued to allow its customers to use the Company's operations for money laundering and to facilitate other various crimes, including human trafficking.

**Additional Duties of the Audit Committee Defendants**

41.     In addition to the general duties discussed above, under its Charter, the Audit Committee Defendants, defendants Devitre, Fayne Levinson, Mendoza, and Lacy, owed specific duties to Western Union to assist the Board in fulfilling its oversight responsibilities with respect to the "Company's compliance with legal and regulatory requirements."  Moreover, the Audit Committee Defendants were specifically tasked with monitoring "the integrity of the Company's financial statements."  Finally, the Audit Committee Defendants were required to review and approve the Company's internal controls.  The Audit Committee received numerous red flags regarding the Company's noncompliance with mandatory anti-money laundering requirements.

42.     The Audit Committee met twelve times in 2010, thirteen times in 2011, twelve times in 2012, and eleven times in 2013. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.  As a result of their meetings and their duties pursuant to the Audit Committee Charter, the Audit Committee Defendants knew or recklessly disregarded that Western Union was failing to comply with applicable laws and that Western Union's financial statements overstated the Company's business prospects and concealed negative trends affecting the Company's business.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

43.     In committing the wrongful acts alleged herein, the defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the defendants further aided and abetted and/or assisted each other in breaching their respective duties.

44.     The purpose and effect of the defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise their violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations.

45.     Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

46.     Each of the defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**BACKGROUND**

**The Applicable Regulations Aimed at Preventing Money Laundering at Western Union and Its Money Transfer Operations**

47.     Western Union is the world's largest money transfer company.  It provides customers with a fast way to send money around the world.

48.     Individual money C2C transfers represent more than 80% of the Company's business, bringing in $3.5 billion in annual revenue.  This revenue is primarily derived from fees that Western Union charges to its customers to transfer money.

49.     Because money transfer operations are known to be popular among money launderers, Western Union, like all money transfer companies, is regulated by various federal and state laws aimed at preventing such crimes.  These laws require Western Union to record and report customer identifications when transferring money abroad.  Specifically, Western Union must obtain and verify customer identities and activity that appears suspicious.  Western Union is required to retain these records for a period of five years.  In addition, the BSA and rules promulgated thereunder also require Western Union to file CTRs with the federal government for money transfers exceeding $10,000.  Parallel state laws impose similar recording and reporting requirements, but may have lower monetary thresholds.  For example, Arizona state law requires Western Union to collect and maintain customer identification information for transfers of $1,000 or more.

50.     Western Union is further required to report suspicious activity by submitting a SAR to the federal government if a transaction involves $2,000 or more and Western Union has reason to suspect that the transaction involves criminal proceeds or is intended to evade any BSA regulation, including the mandatory recording and reporting requirements.  Parallel state laws require that SARs be filed with state financial regulators as well.

**Western Union's History of Violating Mandatory Recording and Reporting Requirements**

51.     Western Union has a history of failing to comply with mandatory recording and reporting requirements, thereby facilitating money laundering by criminal organizations.

52.     In 2002, the New York State Department of Banking discovered during a routine inspection that Western Union was not aggregating transactions totaling more than $10,000 when a customer transferred the money through more than one Western Union agent.  This

created a significant loophole for criminals to structure transactions by simply visiting more than one Western Union location. Following an administrative action by the New York State Department of Banking, Western Union agreed to pay an $8 million fine to resolve the allegations.

53. In light of the New York findings that the Company was not properly aggregating transactions, the Director of the FinCEN at the U.S. Treasury Department began an investigation into whether Western Union was also failing to file SARs. Following its examination, FinCEN concluded that:

> ***Western Union's old procedures and systems were inadequate to comply with SAR requirements*** … because they did not identify all multiple transactions conducted by a customer across agents for a single day. Nor did they identify multiple transactions conducted by a customer through the same or different agents over multiple days. Thus, Western Union failed to file SARs for both types of structured transactions.

54. FinCEN further determined that Western Union had failed to file at least 662 SARs from January 1, 2002 through October 8, 2002. FinCEN concluded that Western Union's failures to file SARs was "willful" because "Western Union failed to establish SAR reporting procedures that would reasonably assure that it could identify and properly report structured transactions." To resolve the allegations, Western Union agreed to pay an additional $3 million penalty and committed that "by June 30, 2003, all its money services business products will be subject to an effective system of review for reporting suspicious transactions under the BSA."

55. In 2003, the California Department of Financial Institutions identified more shortcomings in Western Union's "monitoring and compliance program to ensure that it and its agents complied with the BSA," including failures to timely file SARs. To resolve these allegations, Western Union agreed to improve its anti-money laundering monitoring and compliance program, including taking disciplinary measures with respect to agents that fail to adhere to BSA requirements and an obligation to promptly report such disciplinary measures to

the California Department of Financial Institutions. Moreover, Western Union agreed to change its internal governance by making senior management and the Board directly accountable for Western Union's compliance with BSA requirements.  In particular, Western Union agreed to require its Chief Compliance Officer to report annually to Western Union's senior management ***and Board*** on the progress of the implementation of internal controls, including the results of independent testing and auditing of the internal controls and any disciplinary actions against agents, any state and federal regulatory examinations and enforcement actions, and a report on the resources spent and allocated to the new internal controls program.

56.     In 2005, the Arizona Department of Financial Services conducted an examination of Western Union and a number of Western Union agents in Arizona.  The Department determined that Western Union failed to adequately supervise its agents and that, as a result, "the authorized delegates fail[ed] to keep and preserve records that enable the Superintendent to determine compliance with applicable laws."

57.     On August 18, 2006, Western Union entered into a Consent Order with the Arizona Department of Financial Services.  Western Union agreed to pay $3 million and abide by an order requiring the Company to take action to ensure that its agents would "keep and preserve records that enable the Superintendent to determine compliance with applicable laws ... [r]etain all identifying information records for each transaction involving $1,000.00 or more as required by A.R.S. §6-1241(E)"; and "[c]omply with all Arizona Attorney General's Geographical Targeting Orders for all transactions in the amount of $500 or more."  The Consent Order further required Western Union to identify a senior executive to attend quarterly meetings with the Arizona Attorney General to discuss compliance issues and issues relating to Western Union's supervision of its agents.

58.     On October 10, 2008, Western Union entered into another Consent Order with the Arizona Department of Financial Services after an examination in December of 2007 revealed

that Western Union still failed to keep adequate records of customers' identities for transactions of $1,000 or more.  For example, the Arizona Department of Financial Services identified numerous transfers totaling more than $78,000 that were sent by the same person, from the same Western Union location, on the same date, and at approximately the same time.  Nevertheless, Western Union failed to collect the required identification information.

59.    The Arizona Department of Financial Services noted that Western Union was required to have an effective anti-money laundering program to prevent, not just report, structuring activity, and that Western Union had "[f]ailed to correct this violation from a prior examination."  Specifically, the Arizona Department of Financial Services determined that Western Union had failed to comply with the requirements of the 2006 Consent Order, including the requirement to "keep and preserve records that enable the Superintendent to determine compliance with applicable laws by failing to record the required customer identification."  The Arizona Department of Financial Services imposed a $2 million fine and informed the Company that it could have revoked Western Union's license to transfer money from the state of Arizona.

60.    The Company further refused to comply with subpoenas issued by the Arizona Attorney General and even sued the Arizona Attorney General, Terry Goddard, seeking protective orders to limit law enforcement access to wire transfer information aimed at human traffickers. Attorney General Goddard expressed his frustration with Western Union during his March 2009 testimony before the U.S. Senate Judiciary Committee, stating:

> With Arizona [as] the Nation's leading gateway for human trafficking, I will continue to use all legal means available to deter and prosecute human smugglers. Seizure warrants have proven to be the most effective weapon in the fight. However, ***even though wire transfers are the coyotes' payment method of choice, Western Union still refuses to comply with subpoenas for vital data***. I plan to use every legal means to force the compliance of money transmitters and stop Western Union and other money transmitters from doing business with these brutal criminals.

61.     On February 11, 2010, it became apparent why the Company fought the subpoenas.  On that day, Western Union entered into the Settlement Agreement with the state of Arizona.  As part of the resulting Settlement Agreement, Western Union entered into a Statement of Admitted Facts and agreed to:

- pay $94 million, including $21 million to the Arizona Attorney General's Anti-Racketeering Revolving Fund and $50 million to the Southwest Border Anti-Money Laundering Alliance Fund;

- withdraw the Company's lawsuits against the Arizona Attorney General; and

- accept an independent monitor to evaluate and recommend improvements for Western Union's anti-money laundering compliance program for the Southwest Border Area.

Western Union further agreed that "with respect to transactions that are sent from or received in the Southwest Border Area, in all material respects [to] completely, fully, and timely comply with all legal, record keeping, and reporting obligations imposed on it by applicable state law; by the [BSA] ... and the [BSA] implementing regulations."  Moreover, Western Union agreed to direct all of its directors, officers, and employees to cooperate with the monitor in the execution of its duties, and to provide the monitor with "access to all files, books, records, personnel, transaction and other data, and facilities that fall within the scope of responsibilities of the Monitor."

62.     Western Union admitted that for a period of at least four years, the Company had reason to know that its agents were engaged in money laundering that facilitated human trafficking.  Specifically, Western Union admitted that:

Between 2003 and 2007, Western Union had data and other information available to it, which, when viewed as a whole, gave Western Union reason to know that one or more persons employed at the authorized delegate locations [A, B, C, D, E, F, G, and H] in Arizona and at the locations [I, J, K, L, M, N, O, P outside the United States], while acting within the scope of their employment and motivated at least in part to benefit Western Union, were *knowingly engaged in a pattern of*

- 27 -

*money laundering violations that facilitated human smuggling from Mexico into the United States through Arizona*.

Western Union expressly agreed that the Company, its attorneys, Board, officers, and authorized spokespersons will not make any public statements contradicting this admission.

63.     Finally, assuring that the Board recognized its personal responsibility with respect to the Settlement Agreement, Western Union agreed that its Board would adopt, and did adopt, a binding resolution reflecting its understanding of each and every one of the terms of the agreement.  Six of the eleven current directors—defendants Greenberg, Devitre, Holden, Fayne Levinson, Mendoza, and Miles—were Board members when the Board adopted this resolution. Thus, at a minimum these defendants knew of Western Union's prior violations, their own obligation to adopt and implement effective controls to prevent future violations, and the serious consequences of any ongoing failure on their part to ensure compliance with applicable law.

64.     Pursuant to the Settlement Agreement, an independent monitor was assigned to evaluate and recommend improvements for Western Union's anti-money laundering compliance program for the Southwest Border Area.  Western Union further agreed to direct all of its directors, officers, and employees to cooperate with the monitor, including by giving the monitor "access to all files, books, records, personnel, transaction and other data, and facilities that fall within the scope of responsibilities of the Monitor."

65.     ██ ████ ██████ ████ ██ ██ █████ █████ ██ ████
████████████████████████████  ███████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
███████████████████████

66.     Notwithstanding the Settlement Agreement's requirement that the Company provide the monitor access to relevant information, disputes arose over access sought by the monitor to certain money transfer records.  On March 16, 2012, the monitor filed a motion with the Arizona court overseeing the Settlement Agreement requesting that the court order Western Union to provide the monitor with access to the requested information.  The state of Arizona joined in the monitor's motion.  On January 23, 2013, the court issued a ruling on the monitor's motion.  However, the ruling was filed under seal and is therefore not publicly known.[4]  That same day, on January 23, 2013, the monitor tendered his resignation as the court-appointed monitor, effective March 24, 2013.  On March 15, 2013, the Arizona court appointed a new monitor.

67.



_____

[4] As part of its Demand, plaintiff sought the documents relating to the monitor but the Company refused to provide these documents.

████████████████████████████████████████████████

██████████████████████████.

68.     The Company's continued inability to conform with applicable laws and regulations required Western Union to enter into a supplemental and amended settlement agreement with the state of Arizona on January 31, 2014, which imposed additional and more strenuous requirements.   Among other things, the amended and extended settlement requires Western Union to:

- accept oversight by an independent monitor's over the Company's anti-money laundering programs through at least June 2017;

- provide the states of Arizona, California, New Mexico, and Texas for a period of five years (i.e., until February 2019) with full transaction data relating to all translations sent to or from all locations within the Southwest Border Area involving transactions in amounts of $500 or more;

- implement ten mandatory recommendations by the monitor with respect to subsidiaries other than WUFSI and money transfers involving businesses, not just C2C;

- create a Board Compliance Committee to oversee compliance with the BSA;

- create a Corporate Compliance Committee consisting of senior executives to "take steps to foster an appropriate culture of compliance"; and

- have a Chief Compliance Officer with direct access to the Board and a compliance organization that is independent from the business.

Moreover, the state of Arizona again required that the Board adopt a resolution reflecting its full and complete understanding of the terms of the amendments and extension to the Settlement Agreement.

### THE INDIVIDUAL DEFENDANTS' CONTINUED FAILURE TO IMPLEMENT ADEQUATE INTERNAL CONTROLS TO PREVENT MONEY LAUNDERING AND ENSURE COMPLIANCE WITH APPLICABLE LAWS

#### Current Government Investigations into Western Union

69.     The Company's continued troubles to comply with money laundering and other

- 30 -

applicable laws are a reflection of its still non-existent and lacking internal controls.  On March 20, 2012, the USAO-CDCA informed Western Union that the Company is a target in an ongoing federal criminal investigation into structuring and money laundering.  The USAO-CDCA was initially investigating Western Union agent Shen Zhou International ("US Shen Zhou") and its manager Zhi He Wang ("Wang").  Wang has since pleaded guilty to structuring and is now cooperating with the USAO-CDCA, Federal Bureau of Investigation, and Internal Revenue Service.  The Company has received additional subpoenas from the USAO-CDCA seeking additional documents relating to materials relating to certain other former and current agents, and other materials relating to the Company's anti-money laundering compliance policies and procedures.  The government has interviewed several current and former Western Union employees and has served grand jury subpoenas seeking testimony from several current and former employees.  The USAO-CDCA's investigation is still currently ongoing.

70.     In March 2012, the Company was also served with a federal grand jury subpoena issued by the United States Attorney's Office for the USAO-EDPA seeking documents relating to Hong Fai General Contractor Corp. (formerly known as Yong General Construction) ("Hong Fai"), a former Western Union agent located in Philadelphia, Pennsylvania.  Since March 2012, the Company has received additional subpoenas from the USAO-EDPA seeking additional documents relating to Hong Fai.  The government has interviewed several current Western Union employees.  The USAO-EDPA investigation is still ongoing.

71.     On March 6, 2014, the Company was served with a federal grand jury subpoena issued by the USAO-SDFL seeking a variety of anti-money laundering compliance materials, including documents relating to the Company's anti-money laundering, BSA, and SAR procedures.  Subsequently, the USAO-SDFL served the Company with seizure warrants requiring the Company to seize all money transfers sent from the United States to two agent locations located in Costa Rica for a ten-day period beginning in late March 2014.  On July 8,

2014, the government served a grand jury subpoena calling for records relating to transactions sent from the United States to Nicaragua and Panama between September 1, 2013 and October 31, 2013. The USAO-SDFL investigation is still ongoing.

72.     The Company's compliance failures are not only limited to money-laundering. In addition, the Company is currently being investigated by the SEC for possible securities fraud after its former employees accused it of misrepresenting the performance of its digital unit. In particular, the SEC is reviewing the Company's public statements in 2011 and 2012 that the revenue of Western Union Digital, including westernunion.com and its mobile money-transfer business, would increase to $500 million by 2015. In July 2014, the Company pushed out the target to beyond 2015. The investigation, which had not been previously disclosed by Western Union, came to light on September 3, 2014, when the SEC filed a court action claiming the Company had failed to comply with a subpoena for internal communications about the digital unit forecasts and performance.

## DEFENDANTS HID THE COMPANY'S RELIANCE ON UNLAWFUL ACTIVITY USING ITS SERVICES BY MAKING A SERIES OF IMPROPER STATEMENTS

73.     Even with the Company's efforts to circumvent the compliance controls required by the Settlement Agreement, the few compliance measures the Company did put in place significantly impeded Western Union's Mexican and Latin American businesses and cost more than claimed. As such, in order to avoid the investor backlash that would accompany the market's recognition of the Company's reliance on unlawful activity using its services along the U.S. and Mexico border, the Individual Defendants caused the Company to issue a series of improper statements that: (i) concealed the true nature and scope of the impact that the Settlement Agreement would have on the Company's revenues and revenue growth in its C2C business involving Mexico and Latin America; and (ii) understated the costs and expenses that

the Company was facing in order to comply with its obligations under the Settlement Agreement.

**First Quarter of 2010**

74.    On April 27, 2010, the Individual Defendants caused the Company to issue a press release announcing the Company's earnings for the first quarter of 2010, which highlighted encouraging revenue trends for Mexico.   The press release was improper because it failed to disclose that the positive revenue trends in Mexico were at risk due to the Company's actual or likely burdens and obligations under the Settlement Agreement.   The press release stated, in relevant part:

> The Americas region reported a revenue decline of 3% and a transaction increase of 8%.  The rate of decline in revenue was the lowest since the third quarter of 2008. The region's transaction improvement was driven by strong growth in U.S. domestic money transfer following the fourth quarter 2009 repositioning of the business.   Domestic transactions increased 18%, while revenue declined 13%. The repositioning has contributed to significant increases in transactions, and domestic revenue growth is expected to follow later in the year. ***Mexico recorded declines of 7% in revenue and 3% in transactions, which were significant improvements relative to 2009 trends***.

75.    Similarly, during an investor and analyst conference call and web hosting held by the Company on April 27, 2010, and through a PowerPoint presentation that was presented during that conference call, defendants caused the Company to reiterate the fact that "Mexico trends improved compared to [the fourth quarter of] 2009."

76.    On May 6, 2010, Western Union filed with the SEC a Form 10-Q Quarterly Report for the first quarter of 2010.  The Form 10-Q portrayed an overly positive picture regarding the improving trends in the Company's C2C business involving the Americas (and Mexico in particular).  The Form 10-Q also represented that the Settlement Agreement "resolved all outstanding legal issues and claims" with the state of Arizona and would only cost the Company up to $23 million over the next four years.    These statements were improper because

they failed to disclose that the positive C2C Americas/Mexico trends were at risk due to the Company's actual or likely burdens and obligations under the Settlement Agreement.  The Form 10-Q stated, in relevant part:

> Americas revenue declined despite transaction growth for the three months ended March 31, 2010 compared to the same period in 2009, primarily due to the pricing reductions taken in the fourth quarter of 2009.  Our domestic business experienced revenue declines of 13% on transaction growth of 18% for the three months ended March 31, 2010 due to these factors.  However, the revenue declines moderated from the declines experienced in the three months ended December 31, 2009.  Our Mexico business also contributed to the revenue decline in the Americas region with revenue declines of 7% and transaction declines of 3% for the three months ended March 31, 2010.  Our United States outbound business experienced both transaction and revenue growth in the three months ended March 31, 2010.

*   *   *

> During the third quarter of 2009, the Company recorded an accrual of $71.0 million for an anticipated agreement and settlement with the State of Arizona.  On February 11, 2010, the Company signed this agreement and settlement, which *resolved all outstanding legal issues and claims with the State* and requires the Company to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico will participate with Arizona.  The accrual includes amounts for reimbursement to the State of Arizona for its costs associated with this matter.  In addition, as part of the agreement and settlement, the Company expects to make certain investments in its compliance programs along the United States and Mexico border and to engage a monitor for that program, which are *expected to cost up to $23 million over the next two to four years*.  During the first quarter of 2010, cash payments of $17.0 million were made related to the agreement and settlement.

## Second Quarter of 2010

77.     On July 27, 2010, Western Union issued a press release announcing the Company's earnings for the second quarter of 2010.    Through the July 27, 2010 press release, defendants caused the Company to continue to highlight and emphasize positive revenue trends and momentum for the Company's C2C Americas and Mexico business.  The statements in the press release were improper because they failed to disclose that the positive C2C

Americas/Mexico trends were at risk due to the Company's actual or likely burdens and obligations under the Settlement Agreement. The press release stated, in relevant part:

> The Americas region increased revenue 1% on transaction growth of 12%. The region's transaction improvement was driven by strong growth in U.S. domestic money transfer, *positive trends in Mexico*, and continued strength in U.S.-originated transactions to the rest of the world. Domestic transactions increased 28%, while revenue declined 10%. The repositioning of the U.S. domestic business has contributed to significant increases in transactions, and the Company expects domestic revenue growth to follow later in the year. *In Mexico, revenue increased 4% and transactions grew 5%*.

78.     Similarly, during an investor and analyst conference call and web hosting held by the Company on July 27, 2010, and through a PowerPoint presentation that was presented during that conference call, the Individual Defendants caused the Company to highlight the "Americas improvement" as part of the Company's "[c]ontinued momentum," and how the "Americas [are] leading improvement" in the Company's C2C business segment. Further, a slide in the PowerPoint presentation specifically addressing the Company's C2C Americas business touted how the C2C Americas revenue generated "32% of Western Union revenue," how "[m]omentum continued from recent quarters" in the region, and further emphasized a "[p]ositive quarter for Mexico" and a "[s]olid performance in U.S. Outbound."

79.     On August 4, 2010, the Individual Defendants caused the Company to file with the SEC a Form 10-Q Quarterly Report for the second quarter of 2010. In that filing, defendants approved and authorized a report of revenue and transaction growth in Western Union's U.S. outbound business. The statements in the Form 10-Q were improper because they failed to disclose that the positive C2C Americas/Mexico trends were at risk due to the Company's actual or likely burdens and obligations under the Settlement Agreement. The Form 10-Q stated, in relevant part:

*The Americas region (including North America, Latin America, the Caribbean and South America) of our consumer-to-consumer segment represented 32% of our total consolidated revenue for both the three and six months ended June 30, 2010.   For the three months ended June 30, 2010, the Americas revenue increased due to strong transaction growth, although the increase was partially offset by the impact of pricing actions taken in our domestic business in the fourth quarter of 2009*.   For the six months ended June 30, 2010, revenue declined despite transaction growth due to the pricing actions previously described.

\* \* \*

Americas revenue increased 1% due to transaction growth of 12% for the three months ended June 30, 2010 compared to the same period in 2009, but transaction growth was offset by pricing actions taken in the domestic business in the fourth quarter of 2009.  For the six months ended June 30, 2010 compared to the same period in 2009, revenue declined despite transaction growth also due to the pricing actions taken in the fourth quarter of 2009.  Our domestic business experienced revenue declines of 10% and 12% on transaction growth of 28% and 23% for the three and six months ended June 30, 2010, respectively, due to the same factors. *Our United States outbound business experienced both transaction and revenue growth in the three and six months ended June 30, 2010.  Our Mexico business contributed to revenue growth in the Americas region during the three months ended June 30, 2010 with revenue and transaction growth of 4% and 5%, respectively*.  For the six months ended June 30, 2010, Mexico revenue declined 1% on transaction growth of 1%.

**Third Quarter of 2010**

80.    On September 29, 2010, Western Union issued a press release announcing the Company's estimated third quarter business trends in advance of a September 30, 2010 "Investor Day" held by the Company.   Regarding the Company's C2C business segment, defendants caused the Company to report growing revenues and quoted defendant Ersek as stating "We have made good progress this year, and we continue to have solid transaction growth."   The press release stated, in relevant part:

> *The Company's consumer-to-consumer revenue increased 1%, while constant currency revenue increased 3%. Transactions increased 10%.*  Constant currency revenue and transaction growth rates each improved approximately one percentage point compared to the second quarter.

> The Company's international transactions increased 7%, domestic money transfer transactions increased 35% and ***Mexico transactions increased 2%***.

81.     On September 30, 2010, the Company held its planned "Investor Day," at which the Company, under the direction of the defendants, made numerous presentations regarding its business and growth prospects.   In particular,  through a PowerPoint presentation that was presented, the Company highlighted "[i]mproving trends vs. Banco de Mexico," "optimization of in country network for cash out," and the Company's "3 Brand strategy addressing premium vs. value consumer segments."   The PowerPoint presentation also included a graph, positively depicting  the  improving  transaction  growth  rate  for  Mexico.     Regarding  any  regulatory challenges in Mexico, the PowerPoint presentation simply represented that the Company was "[a]ddressing [the] regulatory environment" in Mexico.   Finally, in touting Western Union's "competitive advantages," defendants caused the Company to tout its purported "Anti-Money Laundering (AML) and regulatory expertise."

82.     On October 26, 2010, Western Union issued a press release announcing the Company's earnings for the third quarter of 2010.   Among the  "[o]perational highlights for the quarter," the October 26, 2010 press release emphasized the "[g]rowth in global consumer-to-consumer (C2C) transactions of 10%, with continued solid performance in each region." Further, regarding the Company's C2C Americas business, defendants caused the Company to represent in the October 26, 2010 press release, in relevant part:

> The Americas region increased revenue 2% on transaction growth of 13%. The region's strong transaction performance was driven by faster growth in U.S. domestic money transfer and continued strength in U.S.-originated transactions to the rest of the world. Domestic transactions increased 35%, while revenue declined 6%. ***Mexico*** revenue declined 1% as ***transactions grew 2%.***

83.     Similarly, during an investor/analyst conference call and web hosting held by the Company on October 26, 2010, and through a PowerPoint presentation that was presented during that conference call, the Company touted about its "10% C2C transaction growth in [the

third quarter]" and the "[s]teady to improved trends across all regions."   Further, a PowerPoint slide specifically addressing the Company's C2C Americas business discussed how the Company's C2C Americas business generated "32% of Western Union Revenue," touted how "[m]omentum continued in the region," emphasized "[s]trong U.S. Outbound results," and highlighted "2% Mexico transaction growth."

84.     On November 5, 2010, Western Union filed with the SEC a Form 10-Q Quarterly Report for the third quarter of 2010.   In the Form 10-Q, defendants caused the Company to continue to portray a positive picture and tout the positive momentum and improving trends in the Company's C2C business involving the Americas (and Mexico in particular), and to continue to represent that the Settlement Agreement "resolved all outstanding legal issues and claims" with the state of Arizona and would only cost the Company up to $23 million over the next four years. These statements were improper because they failed to disclose that the positive C2C Americas/Mexico trends were at risk due to the Company's actual or likely burdens and obligations under the Settlement Agreement.   The Form 10-Q stated, in relevant part:

> The Americas region (including North America, Latin America, the Caribbean and South America) of our consumer-to-consumer segment represented 32% of our total consolidated revenue for both the three and nine months ended September 30, 2010.   *For the three months ended September 30, 2010, the Americas revenue increased due to strong transaction growth, although the increase was mostly offset by the impact of pricing actions taken in our domestic business commencing in the fourth quarter of 2009*.   For the nine months ended September 30, 2010, revenue was flat despite transaction growth due to the pricing actions previously described.
>
> *   *   *
>
> During the third quarter of 2009, the Company recorded an accrual of $71.0 million for an agreement and settlement with the State of Arizona and other states. On February 11, 2010, the Company signed this agreement and settlement, which resolved all outstanding legal issues and claims with the State and requires the Company to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico are participating with Arizona. The accrual includes amounts for

reimbursement to the State of Arizona for its costs associated with this matter. In addition, as part of the agreement and settlement, the Company has made and expects to make certain investments in its compliance programs along the United States and Mexico border and has engaged a monitor for those programs, which are expected to cost up to $23 million over the period from signing to 2013. During the nine months ended September 30, 2010, cash payments of $65.0 million were made related to the agreement and settlement.

**Fourth Quarter of 2010**

85.     On February 1, 2011, Western Union issued a press release announcing the Company's earnings for the fourth quarter of 2010 and the fiscal year ended December 31, 2010. For the fourth quarter of 2010, the press release highlighted "[r]evenue of $1.4 billion, an increase of 3% compared to last year's fourth quarter."  Regarding Western Union's business in its Americas region for fourth quarter, defendants caused the Company to state that the Americas region increased revenue 7% on transaction growth of 11% and that Mexico revenue and transactions each grew 3% in the quarter.  The press release further quoted defendant Ersek as stating:

> *We had a strong finish to 2010. Our consumer-to-consumer revenue trends accelerated*, including the expected turnaround in U.S. domestic money transfer. For the year, we generated $1 billion in cash flow from operations, and returned $750 million to shareholders through stock repurchase and dividends. We also made progress on our key strategic priorities of growing retail channels, expanding electronic channels, developing our product portfolio, and improving processes and productivity.

86.     During an investor and analyst conference call and web hosting held by the Company on February 1, 2011, and through a PowerPoint presentation that was presented during that conference call, Western Union continued to highlight the positive trends in its C2C Americas region business, including Mexico.  Specifically, a PowerPoint slide directed towards the C2C Americas segment touted a revenue increase of 7% and a transactions increase of 11%, and further highlighted how the C2C segment generated "32% of Western Union revenue" and how "U.S. domestic repositioning [was] driving new business."  Further, the slide touted

"[c]ontinued solid U.S. Outbound performance" and a "Mexico 3% transaction and revenue growth."

87.     On February 25, 2011, Western Union filed with the SEC its Form 10-K Annual Report for the fiscal year ended December 31, 2010.  The Form 10-K was signed by defendants Ersek, Scheirman, Greenberg, Devitre, Holden, Lacy, Fayne Levinson, Mendoza, Miles, Stevenson, and von Schimmelmann.  In the Form 10-K, these defendants caused the Company to purportedly identify "[p]ossible events or factors that could cause results or performance to differ materially from those expressed in [the Company's] forward-looking statements."  Although defendants caused the Company to identify as a risk factor the "failure to comply with the settlement agreement with the State of Arizona," the Form 10-K failed to provide any detail or meaningful explanation or disclosure about the nature, extent, and scope of this purported risk. The Form 10-K continued to portray a positive picture and tout the positive momentum and improving trends in the Company's C2C business involving the Americas (and Mexico in particular), and to continue to represent that the Settlement Agreement "resolved all outstanding legal issues and claims" with the state of Arizona and would only cost the Company up to $23 million over the next four years.  These statements were improper because they failed to disclose that the positive C2C Americas/Mexico trends were at risk due to the Company's actual or likely burdens and obligations under the Settlement Agreement.  The Form 10-K stated, in relevant part:

> ***Americas revenue increased 2% on transaction growth of 11% for the year ended December 31, 2010 compared to the prior year due to the pricing actions taken in the domestic business commencing in the fourth quarter of 2009***. Our domestic business experienced revenue declines of 6% on transaction growth of 28% for the year ended December 31, 2010 due to the same factors. However, in the fourth quarter of 2010, our domestic business experienced revenue growth of 7% on transaction growth of 29% as we reached the anniversary of the pricing reductions taken in the fourth quarter of 2009. Our United States outbound business experienced both transaction and revenue growth in the year ended

December 31, 2010. Our Mexico business revenue was flat during the year ended December 31, 2010 on transaction growth of 2%.

* * *

During the year ended December 31, 2009, we recorded an accrual of $71.0 million for an agreement and settlement with the State of Arizona and other states. On February 11, 2010, we signed this agreement and settlement, which resolved all outstanding legal issues and claims with the State and requires us to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico will participate with Arizona. The accrual includes amounts for reimbursement to the State of Arizona for its costs associated with this matter. In addition, as part of the agreement and settlement, we expect to make certain investments in our compliance programs along the United States and Mexico border and have engaged a monitor for those programs, which are ***expected to cost up to $23 million over the period from signing to 2013***.

**First Quarter of 2011**

88. On April 26, 2011, Western Union issued a press release announcing the Company's earnings for the first quarter of 2011. The press release touted the Company's C2C business and further highlighted the C2C "Americas region revenue increase of 6% on transaction growth of 8%." The press release also quoted defendant Ersek as stating:

> The first quarter results demonstrate the benefits of our diversified business, with presence in more than 200 countries and territories. Strong revenue growth in Asia Pacific and ***solid increases in the Americas*** and much of Europe helped deliver another good quarter. Our U.S. domestic money transfer growth trends continued, bill payments revenue declines slowed, and Western Union Business Solutions provided strong growth.

89. Similarly, during an investor and analyst conference call and web hosting held by the Company on April 26, 2011, and through a PowerPoint presentation that was presented during that conference call, defendants caused the Company to tout a reported "[g]ood [s]tart to 2011" and how "[s]trong trends" were continuing in the Company's C2C business. Specifically regarding the C2C Americas business, the PowerPoint presentation included a slide emphasizing a 6% increase in revenues and an 8% increase in transactions, further noting how C2C Americas

for the quarter constituted "32% of Western Union revenue," and highlighting how "Mexico grew revenue and transactions 1%" for the quarter.

90.     On May 4, 2011, Western Union filed with the SEC its Form 10-Q Quarterly Report for the first quarter of 2011.  The Form 10-Q continued to portray a positive picture regarding the momentum, improving trends, and growing revenue for the Company's C2C business involving the Americas (and Mexico in particular), and to represent that the Settlement Agreement "resolved all outstanding legal issues and claims" with the state of Arizona and would only cost the Company up to $23 million over the next four years.  These statements were improper because defendants still gave no indication that the positive C2C Americas/Mexico trends were at risk due to the Company's actual or likely burdens and obligations under the Settlement Agreement.  The Form 10-Q stated, in relevant part:

> ***Americas revenue increased 6% due to transaction growth of 8% for the three months ended March 31, 2011 compared to the same period in 2010***. Our domestic business experienced revenue growth of 8% due to transaction growth of 21% for the three months ended March 31, 2011. Transaction growth in our domestic business was higher than revenue growth due to transaction growth being greater in lower principal bands, which have a lower revenue per transaction. Our United States outbound business experienced both transaction and revenue growth in the three months ended March 31, 2011. ***During the three months ended March 31, 2011, our Mexico business had both revenue and transaction growth of 1%***.
>
>          \*   \*   \*
>
> On February 11, 2010, the Company signed an agreement and settlement, which resolved all outstanding legal issues and claims with the State of Arizona and requires the Company to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico are participating with Arizona.  The accrual includes amounts for reimbursement to the State of Arizona for its costs associated with this matter. In addition, as part of the agreement and settlement, the Company has made and expects to make certain investments in its compliance programs along the United States and Mexico border and has engaged a monitor for those programs, which are ***expected to cost up to $23 million over the period from signing to 2013***.

**Second Quarter of 2011**

91.     On July 26, 2011, Western Union issued a press release announcing its earnings for the second quarter of 2011.  The press release highlighted a "Consumer-to-consumer (C2C) revenue increase of 8% reported and 5% constant currency on transaction growth of 6%," and an "Americas region revenue increase of 5% on transaction growth of 7%."

92.     Similarly, during an investor and analyst conference call and web hosting held by the Company on July 26, 2011, and through a PowerPoint presentation that was presented during that conference call, defendants caused the Company to emphasize how "[s]trong trends continue[d] in C2C," and to reaffirm that the Company was "[r]aising 2011 [r]evenue and [earnings per share ("EPS")] [o]utlook."  Specifically regarding the C2C Americas business, the PowerPoint presentation included a slide emphasizing a 5% increase in revenues and a 7% increase in transactions, and further noted that C2C Americas revenue for the quarter again constituted "32% of Western Union revenue," and noted how "Mexico grew revenue 1% while transactions declined 1%" for the quarter.

93.     On August 2, 2011, Western Union filed with the SEC its Form 10-Q Quarterly Report for the second quarter of 2011.  The Form 10-Q continued to portray a positive picture regarding the positive momentum, improving trends, and growing revenue for the Company's C2C business involving the Americas (including Mexico), and to continue to represent that the Settlement Agreement "resolved all outstanding legal issues and claims" with the state of Arizona and would only cost the Company up to $23 million over the next four years.  These statements were improper because defendants still gave no indication that the positive C2C Americas/Mexico trends were at risk due to the Company's actual or likely burdens and obligations under the Settlement Agreement.  The Form 10-Q stated, in relevant part:

> ***Americas revenue increased 5% and 6%, respectively, due to transaction growth of 7% for both the three and six months ended June 30, 2011 compared to the same periods in 2010***. For both the three and six months ended June 30, 2011,

transaction growth was partially offset by slight price reductions. Our domestic business experienced revenue growth of 9% and 8% for the three and six months ended June 30, 2011, respectively, due to transaction growth of 19% and 20%, respectively. Transaction growth in our domestic business was higher than revenue growth due to transaction growth being greater in lower principal bands, which have a lower revenue per transaction. Our United States outbound business experienced both transaction and revenue growth in the three and six months ended June 30, 2011. Mexico revenue increased 1% for both the three and six months ended June 30, 2011, respectively on transaction decline of 1% for the three months ended June 30, 2011, and flat transactions for the six months ended June 30, 2011.

\* \* \*

On February 11, 2010, the Company signed an agreement and settlement, which resolved all outstanding legal issues and claims with the State of Arizona and requires the Company to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico are participating with Arizona. The accrual includes amounts for reimbursement to the State of Arizona for its costs associated with this matter. In addition, as part of the agreement and settlement, the Company has made and expects to make certain investments in its compliance programs along the United States and Mexico border and has engaged a monitor for those programs, which are *expected to cost up to $23 million over the period from signing to 2013*.

### Third Quarter of 2011

94.     On October 25, 2011, Western Union issued a press release announcing the Company's earnings for the third quarter of 2011.   Regarding the Company's C2C revenue and transactions for the quarter, the press release highlighted a "revenue increase of 6% reported and 4% constant currency on transaction growth of 5%," and touted an "Americas region revenue increase of 6% on transaction growth of 6%."   Further, the October 25, 2011 press release quoted Ersek as stating:

Our business continues to demonstrate its resilience, with revenue growth in each of our major regions and businesses. *Consumer-to-consumer trends remained solid*, bill payments revenue grew for the second consecutive quarter, and business-to-business payments delivered very strong results, with reported revenue growth of 30%. *We are on track to deliver our revenue and earnings per share outlook for the year*.

95.     Similarly, during an investor and analyst conference call and web hosting held by the Company on October 25, 2011, and through a PowerPoint presentation that was presented during that conference call, the Company highlighted how the "[s]olid trends continue[d] in C2C." Specifically regarding the C2C Americas business, the PowerPoint presentation included a slide emphasizing a 6% increase in revenue and a 6% increase in transactions, and noted that C2C Americas revenue for the quarter constituted "31% of Western Union revenue" and that "Mexico grew revenue 5% while transactions increased 2%" for the quarter.

96.     On November 3, 2011, Company filed with the SEC its Form 10-Q Quarterly Report for the third quarter of 2011.  This Form 10-Q continued to cause the Company to portray a positive picture regarding the positive momentum, improving trends, and growing revenue for the Company's C2C business involving the Americas (including Mexico), and to represent that the Settlement Agreement "resolved all outstanding legal issues and claims" with the state of Arizona and would only cost the Company up to $23 million over the next four years.  These statements were improper because defendants still gave no indication that the positive C2C Americas/Mexico trends were at risk due to the Company's actual or likely burdens and obligations under the Settlement Agreement.  The Form 10-Q stated, in relevant part:

> The Americas region (including North America, Central America, the Caribbean and South America) of our consumer-to-consumer segment represented 31% and 32% of our total consolidated revenue for the three and nine months ended September 30, 2011, respectively.  ***For the three and nine months ended September 30, 2011, the Americas experienced revenue growth due to transaction growth***, slightly offset by pricing reductions.
>
> \* \* \*
>
> ***Americas revenue increased 6% for both the three and nine months ended September 30, 2011, compared to the same periods in 2010 due to transaction growth of 6% and 7%, respectively***. For both the three and nine months ended September 30, 2011, transaction growth was partially offset by slight price reductions. Our domestic business experienced revenue growth of 9% and 8% for

- 45 -

the three and nine months ended September 30, 2011, respectively, due to transaction growth of 14% and 18%, respectively.

\* \* \*

On February 11, 2010, the Company signed an agreement and settlement, which resolved all outstanding legal issues and claims with the State of Arizona and requires the Company to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico are participating with Arizona. The accrual includes amounts for reimbursement to the State of Arizona for its costs associated with this matter. In addition, as part of the agreement and settlement, the Company has made and expects to make certain investments in its compliance programs along the United States and Mexico border and has engaged a monitor for those programs, which are **expected to cost up to $23 million over the period from signing to 2013**.

## THE TRUTH SLOWLY EMERGES

97.     The truth about the Company's financial health and its business prospects in its Latin American business began to emerge on an earnings conference call on February 7, 2012. In a PowerPoint presentation accompanying that call, the Company noted that Mexican revenue declined 1%. The Company's stock price dropped by $1.97, or 10%, after this announcement. This resulted in a $1.2 billion drop in the Company's market capitalization.

98.     Three weeks later, in the Company's Annual Report on Form 10-K filed with the SEC on February 24, 2012, Western Union disclosed that its Mexican business "is being affected by on-going changes to [its] compliance procedures related to the [Settlement Agreement]."  The Form 10-K also disclosed that the monitor, put in place under the Settlement Agreement to review the Company's compliance, recommended a number of changes, and such changes would "likely have an adverse effect on [Western Union's] United States to Mexico business."  But the Form 10-K gave little detail regarding the nature or extent of the likely impact, or warn that the Company would likely have to end relationships with thousands of non-compliant agents in Mexico. Nor did the Form 10-K cause the Company to disclose any likely adverse impact the Company's compliance efforts may have on the Company's C2C business involving Latin

America. Finally, the Form 10-K maintained that the Company's costs in complying with the Settlement Agreement would only extend up to $23 million.  The Form 10-K stated, in relevant part:

> We are in the process of making certain changes to our compliance program for transactions from the United States to Mexico, including:
>
> - revisions to agent agreements to increase our ability to oversee the compliance of our agents and subagents;
>
> - reduced thresholds at which our consumers are required to provide identification for transactions from certain states along the United States southwest border; and
>
> - enhancement of our information systems including migrating customer information for our Western Union, Orlandi Valuta and Vigo brands onto a common database and migrating to a standard point of sale system.
>
> ***Such changes will likely have an adverse effect on our United States to Mexico business***. Any additional changes that we elect or are required to make in the United States to Mexico corridor, or similar changes that we may elect or be required to make in other corridors, could have a material adverse effect on our business, financial condition or results of operations.
>
> * * *
>
> During 2009, the Company recorded an accrual of $71.0 million for an agreement and settlement with the State of Arizona and other states, which was paid in 2010. On February 11, 2010, the Company signed this agreement and settlement, which resolved all outstanding legal issues and claims with the State of Arizona and required the Company to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico are participating with Arizona. The accrual included amounts for reimbursement to the State of Arizona for its costs associated with this matter. In addition, as part of the agreement and settlement, the Company has made and expects to make certain investments in its compliance programs along the United States and Mexico border and a monitor has been engaged for those programs. ***The costs of the investments in the Company's programs and for the monitor are expected to reach up to $23 million over the period from signing to 2013.***

99.     Despite the disclosure in the February 24, 2012, Form 10-K, the Company continued to tout its financial health to the public.  In particular, from March 13, 2012, when defendant Scheirman spoke at the Credit Suisse Global Services conference to the Quarterly Report on Form 10-Q filed with the SEC on August 2, 2012, Western Union highlighted its growth, particularly in the Americas (which was subsequently broken down in later financial reporting into two regions: (i) North America (including Mexico); and (ii) Latin America and the Caribbean region ("LACA").  Many of these statements also continued to include the assertion that the cost of the Company's compliance reforms arising out of the Settlement Agreement would only be $23 million.

100.     On October 30, 2012, the Company issued a press release disclosing that its Mexican business decreased significantly as a result of the compliance measures enacted as part of the Settlement Agreement.  Further, the  press release quoted defendant Ersek as stating:

> In the third quarter our revenues increased 1%. ***Business was challenging, as soft global economic conditions, compliance related changes, and competitive pressures in certain money transfer corridors impacted revenues***. Globally, Western Union branded consumer money transfer revenue grew slightly in constant currency terms, with our on-line business once again delivering very good results. We continue to generate strong cash flow, and year-to-date we have now returned over $600 million to shareholders through share repurchase and dividends.

> Ersek continued, "We are continuing to advance our growth strategies: expanding our network in consumer money transfer; adding on-line and other digital capabilities to attract new consumers; acquiring business customers and expanding geographies in our business-to-business segment; and establishing a global presence in stored value. ***As we have progressed through 2012, however, the market environment in consumer money transfer has become more difficult, especially in recent months***. To better position us for the sustainable growth of this business we are implementing a series of strategic actions, with a focus on enhancing our value proposition, continuing to invest in the fast growing digital channels, and further optimizing our cost structure."

101.    That same day, Western Union management discussed the Company's third quarter of 2012 results on an earnings conference call.  During that conference call, defendants were forced to admit that Western Union had "ended relationships with over 7,000 Vigo agent locations that could not meet our new compliance requirements" and that Western Union "experienced operational challenges from related system implementations for our Vigo brand in Latin America as we moved this onto our Western Union platform."  According to defendant Ersek, these declines in Western Union's Vigo and Orlandi Valuta brands resulted in a more than 20% decline in overall revenue, and Western Union was "likely to see similar revenue trends from Mexico over the next few quarters."  Specifically, defendant Ersek stated:

> In the third quarter, we implemented a series of new system requirements that impacted our Vigo, and our Orlandi Valuta agent networks. ***As many of our agents could not meet the new requirements to increase our real time transaction visibility, we had to end those relationships, which resulted in a reduction of approximately 7,000 locations, or 40% of our network in Mexico.*** New requirements and system conversions for Vigo also caused disruption to our business in several Latin American countries.

102.    The Company's stock price dropped by $5.20, or nearly 30%, after the announcements on October 30, 2012.  This resulted in a $3.2 billion drop in the Company's market capitalization.

103.    A week later, on November 6, 2012, the Company disclosed as part of its Quarterly Report on Form 10-Q filed with the SEC, that Western Union's costs for upgrading its compliance would exceed $23 million.  The Form 10-Q stated, in relevant part:

> On February 11, 2010, the Company signed an agreement and settlement, which resolved all outstanding legal issues and claims with the State of Arizona and required the Company to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico are participating with Arizona. The accrual included amounts for reimbursement to the State of Arizona for its costs associated with this matter. In addition, as part of the agreement and settlement, the Company has made and expects to make certain investments in its compliance programs along the United States and Mexico border and a monitor

has been engaged for those programs. The costs of the investments in the Company's programs and for the monitor are expected to be $23.0 million over the period from signing to 2013, pursuant to the terms of the agreement and settlement; however, **_actual costs incurred for these programs will likely exceed this amount_**. If the Company is unable to satisfy the material obligations under the agreement and settlement, the State of Arizona could declare the Company in breach and could initiate civil or criminal actions which could have a material adverse effect on our business, financial condition or results of operations.

104.    The truth about the Company's operations was further disclosed in 2013.   In February 2013, the Company disclosed that it spent over $40 million on its compliance upgrades since entering into the Settlement Agreement.   Further, the Company disclosed that it did not expect to meet all of its compliance obligations under the Settlement Agreement within the prescribed timetable.   The Company explained that the monitor may continue to make more recommendations that may cause the Company to further modify its C2C business operations, and warned that "any additional changes that we elect or are required to make in the United States to Mexico and the United States to Latin America and the Caribbean corridors, or similar changes that we may elect or be required to make in other corridors or for our other services, could have a material adverse effect on our business, financial condition or results of operations."

105.    The bad news continued at the Company.   On November 18, 2013, Moody's Investors Service announced that it downgraded Western Union's senior unsecured rating to Baa2 from Baa1.   Moody's explained that it downgraded Western Union mostly because of Western Union's large and increasingly higher compliance costs.

106.    Then on February 3, 2014, the Company filed a Form 8-K Current Report with the SEC announcing that Western Union and the state of Arizona had entered into the January 2014 amendment to the Settlement Agreement.   The Form 8-K stated, in relevant part:

The Amendments extend the term of the Settlement Agreement until December 31, 2017, and impose obligations on the Company and WUFSI in

connection with WUFSI's anti-money laundering compliance programs and cooperation with law enforcement. In particular, the Amendments require WUFSI to continue implementing the primary and secondary recommendations made by the monitor (the "Monitor") appointed pursuant to the Settlement Agreement related to WUFSI's anti-money laundering compliance program, and include, among other things, timeframes for implementing such primary and secondary recommendations. Under the Amendments, the Monitor may make additional primary recommendations until January 1, 2015, and additional secondary recommendations until January 31, 2017. After these dates, the Monitor may only make additional primary or secondary recommendations, as applicable, that meet certain requirements as set forth in the Amendments. Primary recommendations may also be re-classified as secondary recommendations.

***The Amendments provide that if WUFSI is unable to implement an effective anti-money laundering compliance program*** along the U.S. and Mexico border, as determined by the Monitor and subject to limited judicial review, within the timeframes to implement the Monitor's primary recommendations, ***the State may***, within 180 days after the Monitor delivers its final report on the primary recommendations on December 31, 2016, and subsequent to any judicial review of the Monitor's findings, ***elect one, and only one, of the following remedies***:

(i)     assert a ***willful and material breach of the Settlement Agreement*** and pursue remedies under the Settlement Agreement, which could include initiating civil or criminal actions; or

(ii)    ***require WUFSI to pay (a) $50 million plus (b) $1 million per primary recommendation or group of primary recommendations that WUFSI fails to implement successfully. There are currently an aggregate of 73 primary recommendations and groups of primary recommendations***.

If the Monitor concludes that WUFSI has implemented an effective anti-money laundering compliance program along the U.S. and Mexico border within the timeframes to implement the Monitor's primary recommendations, the State cannot pursue either of the remedies above, except that the State may require WUFSI to pay $1 million per primary recommendation or group of primary recommendations that WUFSI fails to implement successfully.

If, at the conclusion of the timeframe to implement the secondary recommendations, the Monitor concludes that WUFSI has not implemented an effective anti-money laundering compliance program along the U.S. and Mexico border, the State cannot assert a willful and material breach of the Settlement Agreement but may require WUFSI to pay an additional $25 million.

Additionally, if the Monitor determines that WUFSI has implemented an effective anti-money laundering compliance program along the U.S. and Mexico border but has not implemented some of the Monitor's secondary recommendations or groups of secondary recommendations that were originally classified as primary recommendations or groups of primary recommendations on the date of the Amendments, the State may require WUFSI to pay $500,000 per such secondary recommendation or group of recommendations. There is no monetary penalty associated with secondary recommendations that are classified as such on the date of the Amendments or any new secondary recommendations that the Monitor makes after the date of the Amendments.

The Amendments also require WUFSI to make a one-time payment of $250,000 and thereafter $150,000 per month for five years to fund the activities and expenses of a money transfer transaction data analysis center formed by WUFSI and a Financial Crimes Task Force comprised of federal and state and local law enforcement representatives, including those from the State. In addition, the Amendments require WUFSI to continue funding the Monitor's reasonable expenses in $500,000 increments as requested by the Monitor.

107.   The changes in WUFSI's anti-money laundering program required by the Settlement Agreement, including the amendments, and the monitor's recommendations have had, and will continue to have, adverse effects on the Company's business, including additional costs. Additionally, if WUFSI is not able to implement a successful anti-money laundering compliance program along the U.S. and Mexico border or timely implement a substantial portion of the monitor's primary recommendations, each as determined by the monitor, pursuit of remedies under the Settlement Agreement, including the amendments, could have a material adverse effect on the Company's business, financial condition, or results of operations.

## THE WASTEFUL REPURCHASES

108.   While the Individual Defendants were making and causing Western Union to make misleading and improper statements that artificially inflated the Company's stock price, defendants Ersek, Devitre, Fayne Levinson, Greenberg, Holden, Lacy, Mendoza, Miles, Stevenson, and von Schimmelmann directed or permitted the Company to overpay for its own stock through the massive repurchases discussed herein.  In particular, the Board permitted the

Company to repurchase 90,475,703 shares of its stock at an aggregate cost to the Company of over of $1.6 billion in the two and one-half year period between April 2010 and October 2012.

109.   Defendants Ersek, Devitre, Fayne Levinson, Greenberg, Holden, Lacy, Mendoza, Miles, Stevenson, and von Schimmelmann caused the Company to make these repurchases well after the Settlement Agreement was executed.   As such, defendants Ersek, Devitre, Fayne Levinson, Greenberg, Holden, Lacy, Mendoza, Miles, Stevenson, and von Schimmelmann knew or recklessly disregarded that the Company's share price was inflated due to the improper statements described herein regarding the nature and sustainability of the positive trends, revenue, and revenue growth for the Company's C2C business involving Mexico and Latin America, the Company's purported compliance with applicable laws, and the purported comprehensiveness and effectiveness of the Company's compliance protocols.

110.   As demonstrated by the chart below, under the defendants' direction, the Company bought back its shares at a weighted average price of $18.25, 43% higher than Western Union's closing price of $12.73 per share on October 31, 2012, after the truth of the Company's business prospects and financial health was revealed:

| Repurchase Program | Period | Repurchased Shares | Average Price Per Share | Approximate Aggregate Cost |
|---|---|---|---|---|
| $1 Billion Repurchase Program Authorized on December 31, 2009 | April 1, 2010 - April 30, 2010 | 2,763,300 | $17.64 | $48,744,612 |
| | May 1, 2010 - May 31, 2010 | 3,895,377 | $16.38 | $63,806,275 |
| | June 1, 2010 - June 30, 2010 | 6,628,608 | $15.74 | $104,334,290 |
| | July 1, 2010 - July 31, 2010 | 1,625,431 | $15.48 | $25,161,672 |
| | August 1, 2010 - August 31 2010 | 2,215,439 | $16.02 | $35,491,333 |
| | September 1, 2010 - September 30, 2010 | 2,277,856 | $16.74 | $38,131,309 |
| | October 1, 2010 - October 31, 2010 | 819,267 | $18.01 | $14,754,999 |

| | | | |
|---|---|---|---|
| | November 1, 2010 - November 30, 2010 | 1,627,000 | $17.96 | $29,220,920 |
| | December 1, 2010 - December 31, 2010 | 1,429,347 | $18.43 | $26,342,865 |
| | January 1, 2011 - January 31, 2011 | 4,221,900 | $19.30 | $81,482,670 |
| $1 Billion Repurchase Program Authorized on February 1, 2011 | February 1, 2011 - February 28, 2011 | 10,302,732 | $21.26 | $219,036,082 |
| | March 1, 2011 - March 31, 2011 | 10,619,042 | $21.31 | $226,291,785 |
| | April 1, 2011 - April 30, 2011 | 1,456,732 | $20.84 | $30,358,295 |
| | May 1, 2011 - May 31, 2011 | 2,392,782 | $20.67 | $49,458,804 |
| | June 1, 2011 - June 30, 2011 | 2,805,204 | $19.82 | $55,599,143 |
| | July 1, 2011 - July 31, 2011 | 7,392 | $20.03 | $148,062 |
| | August 1, 2011 - August 31, 2011 | 4,997,431 | $16.38 | $81,857,920 |
| | September 1, 2011 - September 30, 2011 | 3,695,092 | $15.93 | $58,862,816 |
| | October 1, 2011 - October 31, 2011 | 3,555 | $17.99 | $63,954 |
| | November 1, 2011 - November 30, 2011 | - | - | - |
| | December 1, 2011 - December 31, 2011 | - | - | - |
| | January 1, 2012 - January 31, 2012 | 222 | $18.26 | $4,054 |
| | February 1, 2012 - February 29, 2012 | 2,703,206 | $17.79 | $48,090,035 |
| | March 1, 2012 - March 31, 2012 | 5,813,100 | $17.66 | $102,659,346 |
| | April 1, 2012 - April 30, 2012 | 1,135,507 | $18.08 | $20,529,967 |
| | May 1, 2012 - May 31, 2012 | 4,276,897 | $17.15 | $73,348,784 |
| | June 1, 2012 - June 30, 2012 | 4,222,630 | $16.28 | $68,744,416 |

| | | | | |
|---|---|---|---|---|
| | July 1, 2012 - July 31, 2012 | 2,428,648 | $16.94 | $41,141,297 |
| | August 1, 2012 - August 31, 2012 | 2,335,400 | $17.48 | $40,822,792 |
| | September 1, 2012 - September 30, 2012 | 1,640,232 | $18.41 | $30,196,671 |
| | October 1, 2012 - October 31, 2012 | 2,136,374 | $17.20 | $36,745,633 |
| Total: | | 90,475,703 | | $1,651,430,800 |

## INSIDER SALES BY DEFENDANT SCHEIRMAN

111.    At the same time that defendant Scheirman was causing the Company to repurchase Western Union stock at artificially inflated prices, he sold 389,258 shares of his personally held Western Union stock for proceeds of over $8.3 million.  The sale of the stock occurred in two large trades.  The first occurred on March 1, 2011, less than a week after the Company filed its Annual Report on Form 10-K on February 25, 2011.  The second occurred between February 17, 2012 and February 21, 2012, just days before the release of the Company's February 24, 2012, Annual Report on Form 10-K, which revealed some of the truth about the Company's business.  As demonstrated by the chart below, defendant Scheirman's sales are particularly suspicious given that his stock sales during the period tainted by improper statements represented nearly 86% of his holdings.  In comparison, defendant Scheirman sold only 10% of his holdings in the same time period before the relevant period of the wrongdoing discussed herein.

| | |
|---|---|
| Shares Sold | 389,258 |
| Shares Remaining | 63,432 |
| Total Shares Before Sales | 452,690 |
| **Total Proceeds from Sales** | **$8,336,705.56** |
| **% of Total Ownership Sold** | **85.99%** |

112.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████.   Notably,

defendant Scheirman sold his Western Union shares for a weighted average price of $21.42 per

share, over *68%* higher than the $12.73 share price after the truth was revealed about the

Company's business prospects and financial health.   The following is a table showing defendant

Scheirman's suspicious insider sales that occurred during the period:

| Defendant | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | | | | |
| SCHEIRMAN | 3/1/2011 | 362,341 | $21.68 | $7,855,552.88 |
| | 2/17/2012 | 14,269 | $17.96 | $256,271.24 |
| | 2/21/2012 | 12,648 | $17.78 | $224,881.44 |
| | | | | |
| Total: | | 389,258 | | $8,336,705.56 |

## DAMAGES TO WESTERN UNION

113.   As a result of the Individual Defendants' improprieties, Western Union

disseminated improper, public statements concerning its business prospects and compliance with

the Settlement Agreement.   These improper statements have devastated Western Union's

credibility, corporate image, and goodwill, as reflected by the Company's market capitalization

loss discussed above.

114.   Western Union's performance issues also damaged its reputation with the

government, other businesses, and in the capital markets.   The U.S. government considers a

company's ability to comply with applicable laws regulating its industry and not facilitate

heinous crimes such as human trafficking.   Similarly, businesses are less likely to award

contracts to companies that are not stable due to their failure to comply with applicable laws.   In

addition, Western Union's ability to raise equity capital or debt on favorable terms in the future is

now impaired.   The Company stands to incur higher marginal costs of capital and debt because

the improper statements disseminated by the Individual Defendants have materially increased the

perceived risks of investing in and lending money to the Company.

115.    Further, as a direct and proximate result of the Individual Defendants' actions, Western Union has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred in investigating and defending the Company and certain of its officers in the pending securities class action lawsuit;

(b)    potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment in the pending securities class action lawsuit;

(c)    costs incurred from entering into and complying with the amended Settlement Agreement;

(d)    costs incurred from cooperating with and paying potential fines issued by the USAO-CDCA, USAO-EDPA, and USAO-SDFL;

(e)    increased borrowing costs and expenses associated with the Company's credit rating being downgraded as a result of the Individual Defendants' misconduct;

(f)    costs incurred from the Company buying back $1.6 billion worth of its artificially inflated shares of Company stock; and

(g)    costs incurred from compensation and benefits paid to the Individual Defendants.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

116.    Plaintiff brings this action derivatively in the right and for the benefit of Western Union to redress injuries suffered, and to be suffered, by Western Union as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof.  Western Union is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

117.   Plaintiff will adequately and fairly represent the interests of Western Union in enforcing and prosecuting its rights.

118.   Plaintiff was a shareholder of Western Union at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Western Union shareholder.

119.   The current Board of Western Union consists of the following eleven individuals: defendants Greenberg, Devitre, Ersek, Goodman, Holden, Fayne Levinson, Mendoza, Miles, and Trujillo, and non-defendants Frances Fragos Townsend and Robert W. Selander.   Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because the Director Defendants' Conduct Is Not a Valid Exercise of Business Judgment**

120.   Defendants Greenberg, Devitre, Ersek, Goodman, Holden, Fayne Levinson, Mendoza, Miles, and Trujillo's challenged misconduct at the heart of this case constitutes knowingly and consciously presiding over the Company's willful non-compliance with the BSA and parallel state laws and regulations, and the Settlement Agreement.   Defendants Greenberg, Devitre, Ersek, Goodman, Holden, Fayne Levinson, Mendoza, Miles, and Trujillo were repeatedly informed about systemic compliance failures that were exposing the Company to increasingly severe penalties.   One of the first red flags for the Board was the Company paying $11 million in fines imposed by FinCEN and the New York Banking Department in 2003 for failing to comply with the BSA and willfully failing to submit 662 SARs.   Then, later that year, the Company entered into a Consent Agreement with the California Department of Financial Institutions for its failure to implement an adequate anti-money laundering monitoring and compliance program to ensure that it and its agents complied with the BSA.   Three years later, in August 2006, the Company entered into a Consent Order with the Arizona Department of

Financial Institutions and paid $3 million in fines for failing to maintain adequate records and failing to submit SARs.

121.    Further, defendants Greenberg, Devitre, Holden, Fayne Levinson, and Miles, a majority of the Board, served as directors and experienced first-hand the Company's two most recent and notable red flags, the 2008 Consent Agreement and the 2010 Board resolution.  The Company was forced to enter into the 2008 Consent Agreement after the Arizona Department of Financial Services determined that Western Union had failed to comply with the requirements of the 2006 Consent Order, including the requirement to "keep and preserve records that enable the Superintendent to determine compliance with applicable laws."   In addition to imposing a $2 million fine, the Arizona Department of Financial Institutions informed the Company that it could have revoked Western Union's license to transfer money from the state of Arizona.

122.    These same six directors approved the 2010 Board resolution reflecting the Board's understanding of the Settlement Agreement, including a Statement of Admitted Facts declaring that Western Union agents "while acting within the scope of their employment and motivated at least in part to benefit Western Union, were knowingly engaged in a pattern of money laundering violations that facilitated human smuggling from Mexico into the United States through Arizona."

123.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████ ██ ███ ████ ████ ████ ██ ██ ████ █████ ████

████████████████████████████████████████████

█████████████████████████████ ██████████████

████████████████████████████████████████████

████████████████████ ██████████████████████

Notwithstanding these numerous red flags, the Board affirmatively adopted, implemented, and condoned a business strategy based on deliberate non-compliance with mandatory legal requirements aimed at combating money laundering.  Breaking the law is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment.  Accordingly, demand on the Board is excused.

124.    Defendants Greenberg, Devitre, Ersek, Holden, Fayne Levinson, Mendoza, and Miles's decision to direct or permit the Company to overpay for its own stock through the massive repurchases discussed herein is also not protected by the business judgment rule. Defendants Greenberg, Devitre, Ersek, Holden, Fayne Levinson, Mendoza, and Miles allowed the Company to repurchase over $1.6 billion of the Company's artificially inflated stock between April 2010 and October 2012, the same time they were causing Western Union to issue improper statements concerning its compliance with the Settlement Agreement and its business prospects. These defendants were at a minimum grossly negligent in authorizing these repurchases at the same time that they knew or consciously disregarded the fact that the Company's stock was artificially inflated due to the misleading statements alleged herein.  Such a reckless disregard for the Company's assets is, at a minimum, a breach of the Board's duty of care.  Accordingly, the Board's decision to authorize the repurchases is not protected by the business judgment rule. Therefore, demand is futile.

**Demand Is Excused Because a Majority of the Current Board Face a Substantial Likelihood of Liability for Their Misconduct**

125.    As alleged above, defendant Ersek faces a substantial likelihood of liability for breaching his fiduciary duty.  Defendant Ersek, as CEO of Western Union, was ultimately responsible for the Company's operations, financial statements, and internal controls.  However, in complete abdication of his fiduciary duties, defendant Ersek knowingly or extremely recklessly made the improper statements regarding the Company's business prospects and approved the Company's lax control system to allow its network of agents to conduct illegal money transfers.  Accordingly, because defendant Ersek faces a substantial likelihood of liability for his breaches of fiduciary duty, demand upon him is futile.

126.    Defendants Greenberg, Devitre, Ersek, Goodman, Holden, Fayne Levinson, Mendoza, Miles, and Trujillo face a substantial likelihood of liability for wasting billions of dollars of the Company's assets.  Each of these defendants authorized and failed to halt Western Union's massive $1.6 billion repurchase of its own stock.  At the same time that defendants Greenberg, Devitre, Ersek, Goodman, Holden, Fayne Levinson, Mendoza, Miles, and Trujillo authorized and refused to halt the repurchase, they knew the non-public inside information concerning the Company's compliance problems and the impact of the Settlement Agreement on the Company's business prospects.  No reasonable person would have paid the price that these defendants caused the Company to pay for Western Union stock if they knew the non-public information they knew.  Accordingly, defendants Greenberg, Devitre, Ersek, Goodman, Holden, Fayne Levinson, Mendoza, Miles, and Trujillo are liable for the amount that the Company wasted and therefore, demand as to defendants Greenberg, Devitre, Ersek, Goodman, Holden, Fayne Levinson, Mendoza, Miles, and Trujillo is futile.

127.    Defendants Greenberg, Devitre, Ersek, Goodman, Holden, Fayne Levinson, Mendoza, Miles, and Trujillo, comprising nine of the eleven current members of the Board, knew of or recklessly disregarded various red flags that necessarily informed them of the

widespread and willful illegal activities taking place within the Company, including: (i) Western Union paying $11 million in fines imposed by FinCEN and the New York Banking Department in 2003 for failing to comply with the BSA and willfully failing to submit 662 SARs; (ii)  the 2003 agreement with the California Department of Financial Institutions requiring the Chief Compliance Officer to annually inform the Board about any disciplinary actions against agents and any state and federal regulatory examinations and enforcement actions; (iii) the 2006 Consent Order entered into with the Arizona Department of Financial Services; and (iv) the 2008 Consent Order entered into with the Arizona Department of Financial Services.   Moreover, defendants Greenberg, Devitre, Holden, Fayne Levinson, Mendoza, and Miles, comprising six of the eleven members of the current Board, face a substantial likelihood of liability because they each approved the Board resolution evidencing the Board's full understanding of each of the terms of the Settlement Agreement.

128.   In addition to the reasons stated above, defendants Devitre, Fayne Levinson, and Mendoza are also conflicted from considering a demand because they face a substantial likelihood of liability as a result of their conduct on the Audit Committee.  As set forth above, the members of the Audit Committee had the specific responsibility to assist the Board with overseeing Western Union's compliance with legal and regulatory requirements.  As such, these defendants were informed of numerous red flags that notified them of the widespread and willful illegal activities taking place within Western Union. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████     █████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████. As a result of their meetings and their duties pursuant to the Audit Committee Charter, the Audit Committee Defendants knew or recklessly disregarded that Western Union was failing to comply with applicable laws and that Western Union's financial statements overstated the Company's business prospects and concealed negative trends affecting the Company's business. Accordingly, defendants Devitre, Fayne Levinson, and Mendoza face a substantial likelihood of liability rendering any demand upon them futile.

129. Similarly, defendants Devitre, Fayne Levinson, Miles, Holden, and Lacy are also conflicted from considering a demand because they face a substantial likelihood of liability as a result of their conduct on the Corporate Governance and Public Policy Committee. As set forth above, the members of the Corporate Governance and Public Policy Committee were tasked with "develop[ing] and recommend[ing] to the Board corporate governance guidelines for the Company" and "review[ing] and advis[ing] the Board regarding matters of public policy and social responsibility as they relate to the Company." ████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████     █████████████████████████████████████████████

██████████████████████████████████████████████████. As such, defendants Devitre, Fayne Levinson, Miles, Holden, and Lacy were informed of numerous red flags that informed them of the widespread and willful illegal activities taking place within Western Union. In violation of their duties to Western Union and its shareholders, defendants Devitre, Fayne Levinson, Miles, Holden, and Lacy failed to intervene and implement an effective anti-money

laundering monitoring to ensure the Company's compliance with the Settlement Agreement. Accordingly, these defendants face a substantial likelihood of liability rendering any demand upon them futile.

130.   The acts complained of constitute violations of the fiduciary duties owed by Western Union's officers and directors and are incapable of ratification.

131.   Western Union has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein.   Despite the Western Union Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the Western Union Individual Defendants and the current Board have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct to attempt to recover for Western Union any part of the damages Western Union suffered and will suffer thereby.   The Board's stubborn failure to investigate, correct, and commence legal action against those responsible for the misconduct alleged herein in the face of media and investor scrutiny on the matter, demonstrates that the Board is hopelessly incapable of independently addressing any legitimate demand.

## FIRST CAUSE OF ACTION

### For Breach of Fiduciary Duty Against the Western Union Individual Defendants

132.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.   As alleged in detail herein, the Western Union Individual Defendants by reason of their positions as officers and directors of Western Union and because of their ability to control the business and corporate affairs of Western Union, owed the Company fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage Western Union in a fair, just, honest, and equitable manner.

134.   Defendants Ersek and Scheirman, as Officer Defendants, knowingly, recklessly, or with gross negligence: (i) caused Western Union to fail to comply with its obligations

pursuant to the Settlement Agreement; (ii) made improper statements concerning Western Union's financial health and business prospects that misrepresented the costs and impact of the Settlement Agreement; (iii) caused Western Union to repurchase its artificially inflated stock; and (iv) failed to implement and maintain adequate internal controls.

135.    The Director Defendants, defendants Ersek, Devitre, Fayne Levinson, Mendoza, Greenberg, Miles, Holden, Goodman, Trujillo, Lacy, von Schimmelmann, and Stevenson, as directors of the Company, owed Western Union the highest duty of loyalty.   The Director Defendants knowingly or recklessly breached their duty of loyalty by: (i) causing Western Union to fail to comply with its obligations pursuant to the Settlement Agreement; (ii) making improper statements concerning Western Union's financial health and business prospects that misrepresented the costs and impact of the Settlement Agreement; (iii) causing Western Union to repurchase its artificially inflated stock; and (iv) failing to implement and maintain adequate internal controls.

136.    Defendants Devitre, Fayne Levinson, Mendoza, and Lacy, as the Audit Committee Defendants, breached their fiduciary duty of loyalty by knowingly or recklessly reviewing and approving improper statements in the Company's public filings, press releases, and conference calls.   Additionally, the Audit Committee Defendants failed to ensure the Company's compliance with legal and regulatory requirements.   This constituted a violation of the duties of the members of the Audit Committee under its Charter.

137.    Defendants Devitre, Fayne Levinson, Miles, Holden, Lacy, von Schimmelmann, and Stevenson, as the Corporate Governance and Public Policy Committee Defendants, were specifically tasked with develop[ing] and recommend[ing] to the Board corporate governance guidelines for the Company" and "review[ing] and advis[ing] the Board regarding matters of public policy and social responsibility as they relate to the Company."   The Corporate Governance and Public Policy Committee Defendants breached their fiduciary duty of loyalty by

facilitating the use of the Company's operations for money-laundering and other various crimes, including human trafficking.  This constituted a violation of the duties of the members of the Corporate Governance and Public Policy Committee under its Charter.

138.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

139.    Plaintiff, on behalf of Western Union, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against the Western Union Individual Defendants for Waste of Corporate Assets

140.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

141.    As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the securities class action that the Individual Defendants brought on with their improper statements.  In addition, the Director Defendants wasted Western Union's corporate assets by authorizing and effectuating the repurchase of over $1.6 billion of the Company's stock at prices they knew, or recklessly were unaware, were artificially inflated.  The Individual Defendants also wasted corporate assets by paying improper compensation and bonuses to certain of the Company's executive officers and directors that breached their fiduciary duty.

142.    As a result of the waste of corporate assets, the Western Union Individual Defendants are liable to the Company.

143.    Plaintiff, on behalf of Western Union, has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Against the Western Union Individual Defendants for Unjust Enrichment

144.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

145.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Western Union.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Western Union.

146.     Moreover, defendant Scheirman sold Western Union stock while in possession of material adverse, non-public information that artificially inflated the price of Western Union stock.  As a result, defendant Scheirman profited from his misconduct and was unjustly enriched through his exploitation of material and adverse inside information.

147.     Plaintiff, as a shareholder and representative of Western Union, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

148.     Plaintiff, on behalf of Western Union, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Western Union, demands judgment as follows:

A.     Against all of the defendants and in favor of the Company for the amount of any and all damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment, including any and all damages compensable under the wrong of another doctrine;

B.     Directing Western Union to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Western Union and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be

necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.      a proposal to strengthen the Company's internal controls over money-laundering, including, but not limited to, the controls necessary to ensure compliance with the Settlement Agreement;

2.      a proposal to strengthen the Company' disclosure controls;

3.      a proposal to strengthen the Company's oversight and controls over its stock repurchase program;

4.      a proposal to control insider selling;

5.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

6.      a provision to permit the shareholders of Western Union to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Western Union has an effective remedy;

D.      Awarding to Western Union restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from defendant Scheirman;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: December 10, 2014.                    JONES & KELLER, P.C.


                                             */s/ Daniel A. Wartell*
                                             Daniel A. Wartell, #34902
                                             1999 Broadway, Suite 3150
                                             Denver, CO 80202
                                             Phone: (303) 573-1600
                                             Fax: (303) 573-8133
                                             dwartell@joneskeller.com


                                             ROBBINS ARROYO LLP
                                             George C. Aguilar
                                             Michael J. Nicoud
                                             600 B Street, Suite 1900
                                             San Diego, CA 92101
                                             Telephone: (619) 525-3990
                                             Facsimile: (619) 525-3991
                                             gaguilar@robbinsarroyo.com
                                             mnicoud@robbinsarroyo.com

                                             *Attorneys for Plaintiff*
                                             *Pro Hac Vice Applications Pending*

## VERIFICATION

I, Stephen G. Olish, hereby declare as follows:

I am the Executive Director of The Police Retirement System of St. Louis, plaintiff in the within entitled action. I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _____10/20/14_____

_____
STEPHEN G. OLISH